# BALTIMORE CITY COURT.

---

Filed February 1, 1918.

---

WILLIAM KAMPS, ET AL.,
VS.
ALFRED J. ALEXANDER, ET AL.

---

*Charles F. Harley* for plaintiffs.

*Knapp, Ulman & Tucker, Lee I. Hecht, W. Herdman Schwatka, Joseph A. Clark* and *Barton, Wilmer & Stewart* for defendants.

HEUISLER, J.—

After a verdict for the defendants in the above case was rendered by the jury and duly recorded, a motion for new trial was duly filed by the plaintiffs, and the following and usual general reasons were assigned in support thereof:

a. Because the verdict is against the evidence.

b. Because it is against the weight of the evidence.

c. Because it is against the instructions of the court.

d. Because of newly discovered evidence.

e. Because of error in the rulings or instructions of the court.

f. Because of the misconduct of the jury.

g. Because the verdict was a forced verdict.

h. Because of other reasons to be made known at the hearing.

As to reasons designated as a. and b., where a case has been fairly presented to the jury on conflicting evidence, that jury is the appropriate tribunal to decide the disputed questions of fact, and the court in this case does not feel called upon to revise its conclusions. As to the reasons c., d. and e., the court recognizes no force in either reason and cannot entertain them; and, as to the reason alleged and marked g., the court is at a loss to understand same, and the absence of reference to it in the argument on the motion indicates its entire gratuity, unless, indeed, it means the time taken by the jury to reach its conclusion—that is, from 3.35 P. M. on the afternoon of October 26, 1917, until about 2.30 A. M. of the morning of October 27, 1917, a period of eleven hours' deliberation. If tender consideration for the jury is the meaning, or the fact that the court held the jury together for that period and *forced them* thereby to a conclusion, is its complaint, it is proper to say, in leaving that reason, that a case extending over nearly two weeks of time, and in which more than seven full days were actively taken in the trial work, entirely justifies any reasonable effort of the court to reach a final conclusion.

The remaining reason in support of the motion is, *"because of the misconduct of the jury,"* concerning which both oral testimony and affidavits are submitted. The facts set out in the testimony and affidavits, and the legal principles relating thereto, have been carefully considered. In Volume 2 of Poe, "Pleading and Practice," at Section 348, folio 388, the author says: "A new trial will always be granted upon satisfactory evidence that the jury were fraudulently or corruptly impaneled or 'picked' by one of the parties to the cause; and so, also, where it appears that they were guilty of fraud, *misconduct* or corruption in their verdict." No authorities need be cited for these plain propositions. The

practical difficulty in these cases is, however, *to obtain legal and satisfactory proof of the alleged misconduct.* What takes place in the jury room ought to be and generally is known only to the jurors themselves; *and the rule in Maryland* is well established that their testimony cannot in general be heard to impeach their verdict, whether the conduct objected to be misbehavior or mistake; and for a still stronger reason, their alleged statements or declarations to third persons are inadmissible for such purpose. Legal proof, however, can in some cases be produced in support of the alleged misconduct, and then the questions to be considered will be, first, *whether the alleged misconduct is sufficiently made out,* and, secondly, *whether it affected the verdict;* for it is to be observed that when a jury is once fairly impaneled according to law, and is composed of jurors possessing the requisite legal qualifications, *all reasonable intendments will be made in favor of the proper discharge by them of their important functions; nor will such presumption be allowed to be overcome except by full and satisfactory proof."*

"In general terms it may be stated that where the misbehavior of the jury consists in some * * * improper, dishonest or corrupt conduct, *affecting their verdict,* * * * the new trial will be granted. Each case must be governed by its own special facts and circumstances."

The facts and statements in the oral testimony and affidavits submitted at the hearing of the motion might at this point be considered, and the above rule applied to them; but the court prefers, in addition, to incorporate herein · its examination of the cases referred· to by counsel at the hearing, together with others, before an examination of the said testimony and statements is made. In the case of the United States vs. Reid et al. (1851), reported in 12 Howard 361, the court, at folio 366, speaking through Taney, C. J., says: "The first branch of the second point presents the question whether the affidavits of jurors impeaching their verdict ought to be received," and, continuing, declares: "It perhaps hardly would be safe to lay down any general rule upon this subject. *Unquestionably such evidence ought always to be received with great caution."* In that case the voluntary affidavits of two

jurors was, in substance, as to the first, "that while the case was on trial and the jury were impaneled, a newspaper was sent to him by some of his family from his counting-room, and that he looked slightly over it and saw that it contained a report of the evidence which had been given in the case under trial, and that he read part of it; that while the jury were in their room *deliberating on their verdict* he again read the report of the evidence in the newspaper and thought it correct and that it refreshed his memory; *that it had no influence on his verdict;* that there *was no conversation about the newspaper report in the jury room,* and *that he did not speak of it there to anyone";* and as the second juror, "that he saw the newspaper in the jury room; that he looked over a few sentences and put it aside; that he did not think the report accurate, and *that it had not the slightest influence on his judgment."* The learned Chief Justice in concluding the opinion said: "We are of opinion that the facts proved by the jurors, if proved by unquestioned testimony, *would be no ground for a new trial.* There was nothing in the newspapers calculated to influence their decision, and both of them swear that the papers had not the slightest influence on their verdict."

In the case of Murphy et al. vs. Hindman (1887), 37 Kansas 267, cited by plaintiffs' attorney, among the reasons stated on the motion for new trial was "the misconduct of the jury and· irregularity in the proceedings of the court and jury by which a fair trial was prevented." *A certain marriage contract was a very important feature of this case.* On the motion for a new trial it was shown, folio 269, "that one of the jurors who sat in the case had had several conversations with Campbell (the plaintiffs in the case on trial being surviving heirs of said Campbell) concerning his relations with the defendant, one of them on the day he died, in which Campbell had stated that he had trouble with Mrs. Hindman (the defendant in the case), and, although engaged to marry, he would never marry her. Campbell asked the juror's advice as to how he might get rid of Mrs. Hindman, and the juror advised him in that respect. He also told the juror of the marriage contract, stating what its terms were. Af-

ter several witnesses had given in their testimony and a recess had been taken by the court, the juror told the trial judge of his knowledge and that he knew more about the marriage contract than the witnesses did; but the trial proceeded and the juror continued to sit in the case." The appellate court, in granting a new trial, is no more persuasive than the concluding words of its opinion: "This juror was probably disqualified to try the case."

The case of Hyman vs. Eames et al., 41 Fed. Rep. 676 (Circuit Court of Colorado, 1890), was cited by plaintiffs' attorney. In that case the question on motion for new trial was, quoting the syllabus, "whether, *where a juror declared himself in favor of one of the parties before the trial*—and there is evidence to show that he did so—the affidavits of the other jurors showing that he made similar declarations in the jury room, are admissible." The court says: "It is contended that the affidavits assail the verdict, and for that reason they cannot be considered *under the familiar rule that jurors shall not be allowed to impeach their verdict.* But we are now considering *the competency* of Atkinson to sit as a juror, and upon that question it is believed that the testimony of his associates may be received. The result of the cases cited in Sections 2626 and 2627, 2 Thompson, Trials, is that the testimony may be received on that question, although *in some jurisdictions they are not heard on any point which may tend to overthrow their verdict.* Whether a juror can disqualify himself by anything he may say *after the trial has begun is extremely doubtful,* and therefore it may be said that declarations made during the progress of the trial or in the jury room are not in themselves sufficient proof of incompetency. But where, as in this case, the question is whether a juror previous to the trial committed himself to one of the parties, and there is evidence to show that he so declared himself, the testimony of his associates that he made similar declarations during the trial and in the jury room, becomes very persuasive, and no sound reason is perceived for rejecting it."

The sworn statements of four jurors (filed in the case) that he made statements in the jury room similar to the one which he denied making outside and before the trial, gave preponder-

ance to the allegation that he actually made the outside statement and established the fact of Atkinson's incompetency as a juror *in that he had prejudged the case.*

The case of the State of North Carolina vs. Gamon, 31 L. R. A. (first series) 489 (1895), referred to by counsel of plaintiff, has been examined. Attached to this case is a voluminous and valuable note, and an exhaustive examination of a majority of the cases in said note cited warrants the following conclusions on the general subject:

The general rule is that an essential element in the trial by jury is that the verdict shall be rendered according to the facts of the case lawfully produced to the jury, who are sworn to give their verdict according to the evidence, and if they find without evidence or against the evidence, a new trial will be granted; and a *jury* cannot even render a verdict *upon knowledge within their own breasts;* and a *juryman having knowledge of facts pertinent to the issue must be sworn.* (Mitchum vs. State, 11 Ga. 615.) But the pronouncements, first, that "a jury cannot render a verdict upon knowledge within their own breasts," and second, that "a juryman having knowledge of facts pertinent to the issue must be sworn," *have only this meaning, that that knowledge cannot be used by the jury as an entirety, or by the individual juror with his fellow-jurors in the consideration of the case before verdict,* it being nothing but the unsworn and unexamined belief of either the entire jury, or the unsworn and unexamined statement of the individual juror *and if either is shown to have controlled the verdict,* then the verdict should not stand.

The evidence to be considered by the jury should be the sworn evidence submitted in open court under the safeguards of the law; under the direction of the presiding judge and open to examination liable to be made by countervailing proof on the part of the party who may be affected by it. The oath of the juror is to decide according to the law and the evidence given to him, according to the rules of evidence, in open court, and *he can consider no evidence received outside of the courtroom, and he can submit no such evidence to his fellows in deliberation upon the verdict.*

This is the general rule in both civil and criminal cases, and it is held with extreme tenacity, and its departure is viewed by the law with distrust and aversion.

But jurors can undoubtedly and must use their judgment more or less; they have it in their power to rely on their own views very much if they see fit, *but the law presumes* they will act on testimony chiefly, if not entirely. But it will not be presumed, when they consult together, that the opinions of any one will not have more influence than the opinions of another; and it will be presumed that those opinions operated on and related to the proven facts in the case and not on the statement of any material fact, outside of the proven facts, made by one juror to his fellows. Questions of facts are to be decided according to the evidence introduced, and the personal knowledge of an individual juror cannot constitute a part of that evidence; and "any juror who, after the jury have retired to their deliberation, avails himself of the opportunity of adding to or detracting from the evidence by reason of any peculiar or personal knowledge of the circumstances of the case, violates his duties and is unfitted for his position." People vs. Zieger, 6 Park. Crim. Report, 355.

A jury must in some degree act on their own knowledge of the parties and their witnesses, and *the general rule* that a jury is not at liberty to consider any fact pertinent to the issue unless it is found in the testimony adduced *does not forbid and disqualify* a juror to use his personal knowledge in estimating the weight of the evidence and the character of the witnesses delivering the testimony.

The law regards and respects the oath of a juror, and the juror is presumed by law to know that his oath will not permit him to find a verdict on what he knows himself; and the sanctity of that personal oath is not open to innuendo or collateral attack, *and can only be assailed by direct and substantive proof.*

With this general summary of the legal principles before us, the controlling fact, in the last analysis, is, did any of any juror, or any statement of any juror, or the personal opinion or knowledge of any juror, whether concealed before or expressed after the verdict, *have any control of the verdict itself or act to the prejudice of either litigant,* and by this ultimate test the testimony and affidavits submitted at the hearing of the motion must be considered and determined.

## THE TESTIMONY AND AFFIDAVITS.

As to the oral testimony, Mrs. Blanche A. Waldman, produced on behalf of the plaintiffs, testified that she was in attendance at the trial of the case for only one week; that during that time she stayed in court and heard the trial; *that she did not know Mr. Schiller;* never met him; never talked to him and never saw him to her knowledge; and that she never told anybody that he (Schiller) said the jury was all right; she does not know Mr. Mathison, but does know Mr. Reck.

Alice M. Waldman, produced on behalf of plaintiffs, stated that she testified in the case (for the caveatees); *that she does not know Mr. Schiller and never met him in her life.*

Alfred J. Alexander, produced on behalf of plaintiff, testified that he was standing at the northwest corner of Fayette and Lexington streets, "opposite the court house, with a Mr. Allen, between 8 and 9 o'clock on the evening of the day when the jury were considering their verdict; that while there they were joined by another man whom he had never met before and whose name he did not then know; that he had never seen that man in court as far as he knew; that he had never talked to him before, and *never talked to him in the corridor of the court;* that he never knew his name until November 23, 1917, the night before this motion was argued, and that he was then introduced to him as Mr. Schiller by a Mr. Mathison, who had been one of the jurors in the case.

This witness, Alexander, is the executor named in the last will and testament of Elizabeth Everett, which is under attack in this case, and the other witnesses are friends of his and they were called by the plaintiffs in an effort to establish the activities, in the case, of a certain John Schiller, *the result, however, being that they all deny any knowledge or acquaintance with the said Schiller before the verdict;* and Schiller himself, in his affidavit, filed at the hearing, deposed "that he is not now and never was personally acquainted with any of the parties to

the case, and was not interested in the outcome thereof * * * and, being an outsider, is greatly surprised to find his name brought into the matter."

Thomas W. Montgomery, produced on behalf of plaintiff, testified that Schiller was pointed out in the court room during the trial, and that he saw Alfred L. Alexander talking to Schiller "out in the lobby of the court." This witness *amplifies this statement in his affidavit* (filed before he testified orally) by including as present in a talk with Schiller "during recess on the 26th of October, 1926," the jurors, Casey, Mathison and Vollman, and his brother, Harry T. Montgomery, repeats that affidavit in all its specific statements.

Burdette B. Webster, of counsel for plaintiff, and produced on behalf of plaintiff, testified that "he saw Mr. Alexander talking to a gentleman in the corridor of the court house, *who was described* to him by other people as Mr. Schiller, and that he *saw this after the jury had retired to make up their verdict.*"

John A. Goeppner, the last witness called by plaintiff, testified that, *while the trial was in progress*, he did speak to the juror, Mathison, whom he had known for a long while, 15 or 18 years, and did tell him that he (Mathison) was hearing the case of a friend of his (Goeppner), and that he (the friend, Mr. Alexander) was all right; he also told Mathison, *after the verdict*, that the old lady, Mrs. Everett, was all right; and he also testified *that the case itself was not at all discussed* by him with the juror (Mathison) *until after the verdict.*

Lee I. Hecht, of counsel for defendants, and called on behalf of defendants, testified that after much effort he located the man, Schiller, spoken of by the other witnesses, and that Schiller told him (and there was no objection to this testimony) "that he had a personal engagement with the juror, Mathison, and knowing that he was on the jury he came to Lexington and Fayette streets to wait for him (if the jury should agree); that while there he saw and talked to Mr. Alexander (who was standing at the corner also) to whom he (Schiller) was not known, and to whom he did not make himself (Schiller) known; *that he had never met Alexander before*, and that he talked to him without making himself

known; and that when Mathison did not come he (Schiller) went home, between 11 and 12 o'clock.

None of this oral testimony affects the motion now under consideration, and could not be seriously considered in impeachment of the verdict, and is only here set down that it may be referred to and examined (if necessary) when the affidavits filed come to be considered, which will now be done.

William C. Kirkley was a member of the jury *and the foreman thereof*, and he makes, in due form, the following affidavit: "That Juror Herman Vollman stated to him and others, *after the verdict had been agreed upon*, that he, Vollman, was a friend of Mr. and Mrs. Alfred L. Alexander; that he and Mr. Alexander had been members of the same military company; that he knew Mr. and Mrs. Alexander very well; and that he knew Mrs. Elizabeth Everett in her lifetime, *and that her mind was all right.*"

H. C. Mulliken, Jr., was also a member of the jury and he made an affidavit, in due form, that the juror, Herman Vollman, "admitted to him and others, *after the verdict had been agreed upon*," the matters specifically set out in the Kirkley affidavit.

A counter affidavit was filed, in due form, by the said juror, Herman Vollman, denying the statement charged against him by Kirkley and Mulliken that he said he "knew Mr. and Mrs. Alexander very well," and stating that his acquaintance with Mr. Alexander was limited to his "military association" with him, and "that he has never been in the home of the said Alexander, nor has said Alexander ever been in deponent's home"; that his only acquaintance with Mrs. Alexander "was in meeting her at certain regimental hops that she attended"; that his only knowledge of Mrs. Everett was when, on one or two occasions, she attended said hops with Mrs. Alexander; that he never saw Mrs. Everett after the year 1913; that he has never, since 1913, to his knowledge, spoken to Alexander; that he does not think he has seen him since 1913 until the trial of the case, and that he had absolutely no conversation with Alexander during said trial." The juror, Vollman, also deposed *"that he never talked with Mrs. Everett, and never said anything to anyone about Mrs. Everett's mind or condition."* Deponent also said that

he does not know any John Schiller, and that he does not know any such person.

Applying the test of the legal rule to these three affidavits as affecting the question of misconduct on the part of Vollman: *First*, as to whether the alleged misconduct is sufficiently made out; and *secondly*, as to whether it affected the verdict, *one thing is definite*, that if he made the statements charged in the affidavits of Kirkley and Mulliken "that he knew Mrs. Everett in her lifetime and that her mind was all right," he made them *only after the verdict had been agreed upon*, which was *after* Kirkley and Mulliken and the balance of the jury had *also* made up their minds, from the evidence, that the "mind of Mrs. Everett was all right, and the conclusion is sound, that the statement, if made, *could not in any manner have affected the verdict*.

The fact also must not be overlooked that this was a sealed verdict, and both the Jurors Kirkley and Mulliken, or either of them, or any other juror who heard the statements, could have declined to affirm and render the verdict when it was delivered on the following morning, had any doubt been created in their minds by the statements, if made, as to its correctness or propriety. And again, the clear and detailed affidavit of Vollman as to his knowledge and association with Mrs. Everett and the Alexanders (which knowledge and association is confirmed in the affidavit of Mr. Alexander filed at the hearing) ; and his denial, under oath, that he made any such statements satisfies the court that the alleged misconduct, if misconduct it be, *is not sufficiently made out,* and the verdict should not be disturbed, set aside and impeached, by reason of the matters set out in the affidavits of the jurors, Kirkley and Mulliken.

An affidavit, in due form, was also filed by Ferdinand Schilling, in which deponent said "that on November 2, 1917, James G. Mathison (one of the jurors in the case) admitted to him that he (Mathison) was a guest of Charles A. Reck on Sunday, October 21, 1917, at an oyster roast at a shore or club on this side of Light street bridge, and that this was the first time that he (Mathison) had ever been there" ; and another affidavit, in due form, was also filed of Louis H. Brown-

ing (one of the jurors in the case), "that Juror James G. Mathison admitted to him (Browning) and others, during the trial of the case, that on the Sunday morning during the trial he was the guest of Charles A. Reck, one of the witnesses for the defendants, at an oyster roast." Both Mathison, the juror, and Charles A. Reck *deny that they attended this oyster roast together and that Mathison was the guest of Reck;* they both admit being present, and both depose that it was a public entertainment of the "Maryland Motor Boat Club," at which 300 or 400 people were present, and to which they both paid an individual admission; and they both further depose *that while they saw one another there there was no conversation at all on the matter between them on that occasion,* their acquaintance being but a casual one. Reck further deposes that on this Sunday, October 21, 1917, he did not know that Reck was a witness in the case, and the court's record of the proceedings in the case shows *that Reck did not testify until October 22,* 1917. There is nothing in these affidavits, or the rule of law applicable to the facts stated in them, which will justify attributing to this visit of the juror, Mathison, any such misconduct as a juror as will warrant the court in disturbing the verdict rendered.

The affidavits of Harry T. Montgomery and Thomas W. Montgomery are that "on the 26th day of October, 1917, *at recess,* they saw a man, whom they since ascertained to be John Schiller, conversing with Jurors Casey, Mathison and Vollman."

Vollman in his affidavit says "that he does not know any John Schiller, and never spoke to any such person."

Casey in his affidavit says "that he does not know John Schiller and cannot remember ever meeting him ; and *that he talked with no one,* including the said John Schiller, *in reference to this case, except with members of the jury on that special panel;* and John Schiller himself files an affidavit in due form in which he says that he is a personal friend of James G. Mathison; that having no work to do he was in court on Friday, October 26, 1917, attracted by the arguments in the case; that during recess on that day he saw Mathison outside of the court house and spoke to him and was introduced by Mathison to several members of the

jury whose names he does not remember; "that he has no recollection of any conversation with the jurymen, Mathison, Casey and Vollman," as set out in the Montgomery affidavits, "although he may have spoken to them," and "that he is not now and never was personally acquainted with any of the parties to this case, and was not interested in the outcome thereof, and did not discuss the same with any of the jurymen; and being an outsider, is greatly surprised to find his name brought into the matter." And here the affidavits end.

It was insisted at the hearing of the motion that the juror, Vollman, was disqualified by reason of his expression of a personal knowledge of the mental condition of Mrs. Everett, that being the vital enquiry in the case, but in the face of his absolute denial of the statements attributed to him, and, *when it is the uncontradicted fact that the statements*, if made, *were made after the verdict had been agreed upon.* the court feels justified in repeating its conclusion hereinbefore set out, that the statement, if made, is not shown by the legal and satisfactory proof, required by the law, in any manner to have affected the verdict or demonstrated the disqualification as a juror, charged against the said Vollman.

The court will prolong this statement no further. The legal rule has been set out, and the testimony, it must be evident, has been carefully examined in detail, and set down in this statement. Applying the rule to the facts the court finds no reason, in either, to sustain the motion for any of the grounds stated, *and the same will be overruled.*